Filed 7/2/26  Dilonell v. Ammons CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| FRIDA DILONELL, as Trustee, etc.,<br><br>      Plaintiff, Cross-defendant and Respondent,<br><br>      v.<br><br>JOHN SAMUEL AMMONS,<br><br>      Defendant, Cross-complainant, and Appellant. | B330813; B334468<br>(Los Angeles County Super. Ct. No. 18STPB05025) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gus T. May, Judge.  Affirmed.

Decker Law, James Decker and Griffin Schindler for Defendant, Cross-complainant and Appellant.

Oldman, Apanius, Gordon & Rosenblatt, Mary-Felicia Apanius, Marshal A. Oldman and Susan B. Rosenblat for Plaintiff, Cross-defendant and Respondent.

_____

Alice Jackson died in February 2018 when she was almost 77 years old.  Frida Dilonell, a late-in-life acquaintance of Jackson's, filed a petition to determine ownership of property included in a handwritten September 2017 declaration of trust bearing Jackson's signature, which named Dilonell as the primary beneficiary of nearly all of Jackson's assets.  In response, John Samuel Ammons filed a petition to set aside the trust, arguing Jackson lacked testamentary capacity to execute it and had signed a subsequent typed trust that left her assets to Ammons.

Following a bench trial, the probate court found the September 2017 trust was valid and that Jackson had testamentary capacity to execute it.  The court also found Jackson did not create a superseding typed trust.  On appeal, Ammons challenges the court's findings and contends judicial estoppel bars Dilonell from asserting Jackson's mental competency in this action because she took a contrary position in a related action.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Petitions, the 2015 Will, and the September 2017 Trust*
On May 2, 2018 Ammons filed a petition to probate the will of Alice Jackson in a related action.  A copy of the handwritten will, dated August 22, 2015, named Ammons as executor of

Jackson's estate and left all of her "real and personal property" to Ammons, Jorge Bennett, and Nery Murcia in equal shares. The 2015 will listed Jackson's assets, including real property on Walnut Street in Inglewood (the Walnut property), five bank accounts, music royalties, and the contents of six storage units.

On May 29, 2018 Dilonell, as the successor trustee of the Alice M. Jackson Living Trust, initiated this action by filing a petition to determine trust ownership of property pursuant to Probate Code section 17200, subdivision (b),[1] and *Estate of Heggstad* (1993) 16 Cal.App.4th 943 (*Heggstad*).[2] Dilonell attached to her petition a copy of a fillable form for a declaration of revocable trust dated September 25, 2017 (September 2017 trust) that had been filled out by hand and bears the signature of "Alice M. Jackson." The trust named Jackson as trustee and declared that her interest in the assets listed in the attached schedule A was held in the trust. Schedule A listed nearly all of the assets in the 2015 will, including the Walnut property, checking accounts held in Chase Bank and U.S. Bank, the music royalties, and the six storage units. The trust further named Dilonell as the primary beneficiary of "my estate, [the] Walnut [property], [and] 1/2 interest in music royalties." The petition

---

[1]     Further statutory references are to the Probate Code.

[2]     A "*Heggstad* petition" may be filed to confirm that specified property belongs to a trust and is not part of a decedent's probate estate. (See *Heggstad, supra*, 16 Cal.App.4th at p. 950 ["a written declaration of trust by the owner of real property, in which he names himself trustee, is sufficient to create a trust in that property, and . . . the law does not require a separate deed transferring the property to the trust"].)

3

requested an order determining the assets listed in the schedule A were assets of the trust.

On August 6, 2018 Ammons filed a petition to set aside the September 2017 trust, attaching the 2015 will.  He argued the trust was an invalid forgery; it was obtained through fraud, duress, or undue influence; there was insufficient evidence of Jackson's intent to transfer her assets to the trust; and Jackson lacked testamentary capacity.

## B. *The Evidence at Trial*[3]

The probate court conducted a 10-day bench trial in March and April 2023.  Both Ammons and Dilonell called witnesses who testified regarding the circumstances surrounding the creation of the September 2017 trust and Jackson's conduct and mental faculties around that time.

### 1. *Ammons's relationship with Jackson and Jackson's first stroke*

Ammons testified he met Jackson around 1991 (when he was 30 years old and she was about 50 years old), and he worked for her in Los Angeles for some time.  At some point, Ammons left Los Angeles, but he reestablished his relationship with Jackson in 2012 after returning and becoming her neighbor (when Jackson was about 71 years old).  Jackson provided and cared for

---

[3]     We rely on the amended settled statement for the trial testimony and evidence admitted at trial on seven of the 10 trial dates.  The probate court approved the settled statement proposed by Ammons, after considering Dilonell's requested changes.  There is a reporter's transcript for March 8 and 10 and April 11, 2023.

4

Ammons by arranging food delivery for him, booking his appointments, ensuring he took his medication, and sometimes paying his rent.

In May 2015 Jackson suffered her first stroke. Ammons testified he found Jackson on the ground and helped her, and Jackson was "grateful for [him] saving her life." Ammons testified Jackson told him multiple times she had provided for him in her will, including on February 24, 2018, the day she died.

At trial, Ammons called four witnesses who attested to Ammons and Jackson's close relationship, including Murcia (who was named in the 2015 will). The witnesses met Jackson at some point between 2011 and 2015 and visited her periodically. Ammons was present at all but one of these visits. Two of the witnesses heard Jackson say that she would make Ammons a "wealthy man," and one witness heard her say she was leaving Ammons a portion of her estate.

2. *Jackson's second stroke and admission to a convalescent facility*

In September 2015 Jackson was admitted to a convalescent facility after she suffered a second stroke. Dr. Robert Tracy, Jackson's primary physician at the facility who saw her monthly from the time of her admission to her death, testified the stroke "did not leave [Jackson] with cognitive deficits; she was fully competent at all times right up to her death." Dr. Tracy further testified that if Jackson had any cognitive impairments or difficulties, he would have sent her to a nearby sister facility that handled patients with those issues, but he never considered doing so.

3. *The attempted sale of the Walnut property and Dilonell's relationship with Jackson*

Jackson co-owned the Walnut property with Suzanne Chandler, and in May 2016 they decided to list the property for sale. Dilonell submitted an offer for the property, then later accepted a counter-offer for the listing price. The property went into escrow, but escrow did not close because Dilonell refused to pay an additional $100,000 that Chandler demanded for the sale.

Dilonell testified that in mid-to-late 2016, at Jackson's request, the two met at the convalescent facility. Jackson asked Dilonell not to withdraw her offer because the property might not otherwise sell, and instead Dilonell should "pursue . . . Chandler" to enforce the sales agreement. Jackson appeared "very sharp" at the meeting. Following the meeting, Dilonell and Jackson became close friends. Dilonell visited Jackson a few times a week. Jackson shared stories of her life and discussed a variety of issues, including her estrangement from her daughter and sister.

According to Dilonell, Jackson told her she had stopped receiving rent proceeds from the Walnut property, and Chandler had unilaterally fired the Walnut property's manager and represented to the tenants that Chandler was the sole owner of the property. Jackson asked Dilonell if she knew a real estate attorney, and Dilonell recommended Peter Gordon & Associates (the Gordon firm).

4. *The Walnut property action*

Andrew Schoettle, an attorney at the Gordon firm, testified the firm began representing Jackson in June 2017. Schoettle drafted and sent to Jackson a civil complaint to file against

6

Chandler and the Walnut property's new property management company (the Walnut property complaint), along with a verification for Jackson to sign.

The complaint alleged a cause of action for quiet title with respect to Jackson's portion of the Walnut property and 12 related causes of action. In a cause of action for financial elder abuse, the complaint alleged Jackson was "elderly and limited in function, within the meaning of Probate Code § 811, and was substantially unable (a) to manage [her] financial resources or (b) to resist fraud or undue influence." Further, the alleged abuse occurred "due to the inability of the elderly Jackson to take action to remedy and recoup her damages and losses." A cause of action for intentional infliction of emotional distress alleged Jackson "suffer[ed] severe emotional distress" and had been "damaged and harmed . . . mentally." The complaint included a verification for the first cause of action for quiet title.

Schoettle testified he and Jackson typically corresponded by phone or handwritten letter, and that they exchanged documents by mail, by messenger (including Dilonell), or when he visited the convalescent facility. Schoettle testified he never had any questions about Jackson's capacity from when they met in 2017 until her death, and "she always appeared sharp, smart, and tough."

### 5. *A librarian provides Jackson information on living trusts and a fillable trust form*

Chandra Jackson,[4] a librarian for the public library, testified that in early September 2017 she received a call from Jackson requesting information on living trusts. Chandra delivered forms and other pages copied from a book on living trusts to Jackson's convalescent facility. Chandra first met Jackson in November 2017, when Chandra visited Jackson's facility again to drop off the book on living trusts. The book contained a blank version of a fillable form matching the one used to create the September 2017 trust. Jackson told Chandra that "she was going to get her affairs in order." Chandra testified that Jackson appeared "fantastic," and the two talked for 30 minutes to an hour. Chandra saw Jackson two to four weeks later. At that time, Jackson "appeared wheelchair-bound" but "looked well," and the two talked for 30 to 40 minutes. Chandra "didn't notice anything debilitating about [Jackson]. . . . [S]he didn't have trouble speaking or anything like that." Based on their multiple interactions, Chandra believed Jackson was "mentally stable."

### 6. *The September 2017 trust*

Schoettle first learned about the September 2017 trust when Jackson sent it to him along with the Walnut property complaint (with edits) and a signed verification. Schoettle confirmed that the exhibit admitted at trial was the trust

---

[4] We refer to Chandra Jackson by her first name to avoid confusion; she is not related to Alice Jackson.

document Jackson sent to him.[5]  He also confirmed the trust document bore Jackson's signature and schedule A of the trust (the list of assets) was in Jackson's handwriting.  He was familiar with her handwriting from the letters she had sent him.  Jackson and Schoettle "had at least one conversation with Jackson about the trust . . . because she had not provided any contact information for any of the beneficiaries."  At Jackson's request, Schoettle added the trust as a plaintiff in the Walnut property action; the action was filed on behalf of Jackson as an individual and as the trustee of her living trust.  Schoettle filed the action on September 28.

Dilonell testified that at some point between September and November 2017, Jackson gave her a sealed manila envelope with Jackson's name or initials on it, and Jackson told Dilonell the envelope contained her "wishes."  Dilonell did not know what was in the envelope, but she felt uncomfortable and did not open it.  She gave the envelope to the Gordon firm for safekeeping within a week of receiving it.  In early 2018 Dilonell and Schoettle retrieved two or three boxes of documents from the convalescent facility and took them to the Gordon firm's office; the documents were already boxed up when he arrived to pick them up.

Handwriting expert James Black testified for Ammons regarding the signatures on the September 2017 trust.  He had been given numerous exemplars of Jackson's writings and signatures.  He opined the signatures on pages 5 and 9 of the

---

[5]      The original version of the September 2017 trust was not produced at trial.

9

trust were cut and pasted, as shown by a "'line fragment'" on the copy he reviewed. However, the other instances of Jackson's name or signature on the document were consistent with her handwriting and appeared not to be cut and pasted. Black reviewed only a fourth or fifth generation copy of the trust, and he admitted the line fragment could have been the result of numerous reproductions. He also acknowledged that he relied on a different version of the fillable trust form than the one admitted at trial in determining that Jackson's signature was cut and pasted.

7. *The agreement for Dilonell to purchase Jackson's portion of the Walnut property*

In January or February 2018, Jackson and Dilonell entered into an agreement for Dilonell to purchase Jackson's share of the Walnut property. Jackson asked the Gordon firm to serve as the escrow company for the sale.

Schoettle testified the Gordon firm was "involved with documenting" the transaction and received a conflict waiver from Jackson and Dilonell (the Gordon firm previously represented Dilonell). The firm prepared escrow instructions, an amendment to escrow, a promissory note, a long form deed of trust, and a grant deed for the transaction, which were admitted at trial. The amendment to escrow was dated January 20, 2018, notarized, and appeared to be signed by Jackson, Dilonell, and Peter Gordon of the Gordon firm. Schoettle testified the instructions on the note setting forth the payment schedule, interest rate, and credits arose from discussions with Jackson, and that "nothing in the Note . . . was not instructed by [Jackson]."

8.    *The typed trust document*

Ammons testified that approximately two weeks before Jackson's death, Jackson told him to hand her "the blue book and turn to page 6 and take a picture of it because it pertained to him." Ammons saw several pages of a typed document (the typed trust document) but took photographs of only the first and sixth pages. Both photographs were admitted at trial. The first photograph showed a page with only the title "Alice M. Jackson Living Trust." (Underlining omitted.) The second photograph captured only one section of page six, titled "Beneficiaries," which named Ammons as a primary beneficiary of the Walnut property or the net proceeds from its pending sale to Dilonell. The section stated the Walnut property was in escrow for sale "pursuant to the sale escrow and Amendment." Ammons testified he did not see a signature or initials on the document.

Gordon testified that in 2017 or 2018, Jackson gave him a form document with filled-in blanks that he used to create a typed trust for her. He did not recall talking to Jackson about the terms of the trust, but he believed he confirmed its contents with her in some manner. Gordon could not recall who the beneficiaries were, but he did not think Ammons was mentioned. He arranged for a notary to notarize the trust, believed two witnesses signed it, and had a "'vague recollection'" of being there when Jackson signed the document. He stated the original document would have been maintained in his files. When shown the two pages of the typed trust document, Gordon stated, "'I have not seen any typed document with Mr. Ammons' name on it.'" He acknowledged his recollections were vague because he had not been involved with the matter for six years, and he had turned the matter over to Schoettle.

11

Schoettle testified he never saw a typed trust and had no idea where the purported typed trust document came from.

9.   *The assignment of rights, Jackson's death, and Dilonell's discovery of the September 2017 trust*

On February 23, 2018 Jackson and Dilonell executed an agreement assigning Jackson's rights and interest in the Walnut property action to Dilonell.  The Gordon firm prepared the agreement pursuant to Jackson's instructions.  Jackson died on February 24.

Approximately two months later, Dilonell visited Schoettle's office and went through the boxes of documents (with Schoettle present) that Schoettle had taken from Jackson's facility for safekeeping.  Dilonell found an open white cardboard envelope in one of the boxes, which contained a sealed envelope similar to the one Jackson had previously given Dilonell.  Dilonell believed the sealed envelope had Jackson's name or an initial on it, but she did not recall.  Dilonell opened the sealed envelope and found a signed copy of the September 2017 trust that had been "filled out," with a business card with librarian Chandra's name attached to it.  Dilonell testified she showed the trust document to Schoettle.  The business card had handwriting on the back, which Dilonell testified was consistent with Jackson's handwriting.  The note read, "Received from Bill . . . in business office on . . . 9/15/17 . . . attached to a note and living trust form. Met [Chandra] on November 15th, 2017 at [the convalescent facility]."  Dilonell testified this was the first time she learned about the trust.

Ammons testified that after Jackson died he went to the Gordon firm to obtain a complete version of the typed trust

12

document, and Gordon told him he would receive monthly payments from the Walnut property and proceeds from its sale. Schoettle confirmed Ammons visited the firm after Jackson died claiming a "'trust fund'" existed, but Schoettle and Gordon told Ammons they did not know to what document Ammons was referring. Ammons showed Gordon and Schoettle the photographs of the purported typed trust, but Schoettle had never seen the document before.

C.    *The Probate Court's Statement of Decision*

In a nine-page statement of decision, the probate court granted Dilonell's *Heggstad* petition (except as to one storage unit), finding the assets listed in schedule A of the September 2017 trust were the assets of the trust. The court denied Ammons's petition to set aside the September 2017 trust. The court found the trust was "Jackson's sole, validly executed trust" based on Chandra's credible testimony, the completed fillable trust form, and the note Jackson wrote on the business card paperclipped to one of the trust copies, which documented Jackson's receipt of the fillable trust form 10 days before she executed the trust (on September 15). Jackson completed the form in her own handwriting and signed it, intending it to be her trust. The court did not find persuasive Ammons's handwriting expert, who based his testimony on a different version of the trust form and acknowledged that Jackson handwrote much of the trust document, including five instances of her name.

The probate court further found the September 2017 trust "[met] the requirements of Probate Code sections 15200-15206, with the exception of section 15202's requirement that there be trust property." However, the trust's schedule "provides a great

13

level of detail regarding the assets Jackson intended to place into the Trust," and "Jackson clearly intended that the assets included in [the] Schedule [] . . . be considered trust assets." The court therefore "order[ed] that those assets . . . are Trust assets."

The probate court found Jackson had testamentary capacity when she signed the September 2017 trust document. Every witness who knew Jackson in 2017 and 2018 "was unequivocal that, through her passing, she was sharp, knew what she wanted, knew her assets, and was able to identify her biological family." Dr. Tracy, who saw Jackson until the day she died, provided a similar account, which was corroborated by the details Jackson wrote in the trust document. Further, Jackson "took notes, wrote detailed letters, and continued to do so during her entire stay in the convalescent home."

The probate court found there was no typed trust, explaining "there was no evidence—aside from [the two photographs of trust pages presented by Ammons] and Ammons's testimony—that Jackson ever created [the typed] version of a trust." The court observed that no other pages of a typed trust were introduced; no witnesses testified that they had seen signed version of the typed trust document (including Ammons); and there was no testimony that Jackson ever told Schoettle, to whom she delivered her handwritten trust, that she executed a new version of the trust. Further, Ammons "contradicted himself on multiple occasions while on the stand," and "[h]is testimony conflicted with what was stated on numerous documents" and was "impeached by several other witnesses," including Schoettle and Gordon. The court was not persuaded Jackson changed her mind after executing the September 2017 trust given that she

14

verified the Walnut property complaint in her capacity as trustee and never indicated to Schoettle that she was revoking the trust.

Finally, the probate court found the Gordon firm did not create another trust. Although Gordon suggested his office may have used Jackson's completed fillable trust form as a template for a typed trust, his memory had faded over the prior five years, and he did not recognize the two pages of the typed trust document that Ammons showed him. In addition, the September 2017 trust did not mention Ammons, and it was more likely that Gordon was recalling a notarized amendment to the sale escrow document that Gordon witnessed Jackson sign.

On August 21, 2023 the court entered a judgment granting Dilonell's petition to determine the September 2017 trust's ownership of property (except for the storage unit) and denied Ammons's petition to set aside the September 2017 trust.

Ammons timely appealed.

## DISCUSSION

A. *Standard of Review*

Typically, "[i]n reviewing a judgment based upon a statement of decision following a bench trial . . . [w]e apply a substantial evidence standard of review to the trial court's findings of fact." (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981; accord, *Hamlin v. Jendayi* (2024) 105 Cal.App.5th 1064, 1074 [probate appeal].) However, "'"where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law."'" (*In re Marriage of Diamond* (2024) 106 Cal.App.5th 550, 566; accord, *Estate of Berger* (2023)

15

91 Cal.App.5th 1293, 1297, 1307 [applying standard in probate case to question whether "the facts of this case compel, as a matter of law, a finding . . . that the drafter of the document at issue here intended the document at issue to make a revocable disposition of property that takes effect upon her death"].)  Under the compels a finding standard, the party with the burden of proof at trial must show on appeal that its evidence was "(1) ""uncontradicted and unimpeached"" and (2) ""of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding."""" (*Atkins v. City of Los Angeles* (2017) 8 Cal.App.5th 696, 734; accord, *Diamond*, at p. 566.)

Ammons challenges the probate court's finding that Jackson had testamentary capacity in drafting the September 2017 trust; that the September 2017 trust was a valid trust; and that the typed trust document did not constitute a valid trust.  "'A person challenging the validity of a trust instrument on the grounds that the trustor lacked capacity to execute the document . . . carries the heavy burden of proving such allegations.'" (*Eyford v. Nord* (2021) 62 Cal.App.5th 112, 122 (*Eyford*).)  Likewise, "[t]he burden of proving the elements necessary to establish a trust rests upon the party asserting its existence." (*McKinnon v. McKinnon* (1960) 181 Cal.App.2d 97, 104; accord, *Cohn v. Cohn* (1933) 130 Cal.App. 349, 350, 355.) Because Ammons bore the burden of proof on these issues at trial, we review whether Ammons presented evidence that compels a finding in favor of Ammons as a matter of law.

To the extent Ammons's appeal presents questions of law, we review the questions de novo.  (*Carne v. Worthington* (2016) 246 Cal.App.4th 548, 555-556 [applying de novo review to

16

question of whether a separate deed was required to transfer property into a trust]; *Kucker v. Kucker* (2011) 192 Cal.App.4th 90, 93 ["'The [probate] court's construction of the Probate Code is subject to our de novo review.'"].)

B.    *The Evidence Does Not Compel a Finding That Jackson Lacked Testamentary Capacity*

1.    *Governing law on testamentary capacity*

Ammons contends we should apply the mental capacity standard for making decisions and entering contracts set forth in sections 810 and 811; Dilonell argues the lower standard in section 6100.5 for preparing wills applies. Dilonell has the better argument.

As the Court of Appeal explained in *Doolittle v. Exchange Bank* (2015) 241 Cal.App.4th 529, 545 (*Doolittle*), "A person challenging the validity of a trust instrument on the grounds that the trustor lacked capacity to execute the document or did so under the undue influence of another carries the heavy burden of proving such allegations. Section 810, subdivision (a) creates 'a rebuttable presumption affecting the burden of proof that all persons have the capacity to make decisions and to be responsible for their acts or decisions.' Under section 811, a determination that a person lacks the capacity to execute a trust must be supported by evidence of a deficit in at least one of specified mental functions that 'by itself or in combination with one or more other mental function deficits significantly impairs the person's ability to understand and appreciate the consequences of his or her actions with regard to the type of act or decision in question.' (§ 811, subd. (b); see *id*., subd. (a).)"

17

However, "in determining capacity to execute a trust amendment that 'in its content and complexity, closely resembles a will or codicil,' the courts have held that the lower mental capacity standard for the making of a will [under section 6100.5] should apply." (*Doolittle, supra*, 241 Cal.App.4th at p. 545; see *Andersen v. Hunt* (2011) 196 Cal.App.4th 722, 731 (*Andersen*) [§ 6100.5 applied to evaluation of decedent's capacity to execute trust amendments that "in [their] content and complexity, closely resemble[d] a will or codicil"]; *Eyford, supra*, 62 Cal.App.5th at p. 122, fn. 6 ["[w]e . . . see no reason why section 6100.5 should not apply where, as here, a trust amendment reallocates the trust estate by disinheriting one set of possible beneficiaries and giving the entire estate to another beneficiary"]; cf. *Lintz v. Lintz* (2014) 222 Cal.App.4th 1346, 1352-1353 (*Lintz*) [contractual standard in §§ 810 and 811 applied because the trust instruments "were unquestionably more complex than a will or codicil" in that they "addressed community property concerns, provided for income distribution during the life of the surviving spouse, and provided for the creation of multiple trusts, one contemplating estate tax consequences, upon the death of the surviving spouse"].)

Under section 6100.5, an individual is competent to make a will when he or she understands "the nature of the testamentary act"; "understand[s] and recollect[s] the nature and situation of [his or her] property"; and "remember[s] and understand[s] [his or her] relations to living descendants, spouse, and parents, and those whose interests are affected by the will." (§ 6100.5, subd. (a)(1)(A)-(C).) "'[T]he standard for testamentary capacity [under section 6100.5] is exceptionally low.'" (*Doolittle, supra*, 241 Cal.App.4th at p. 545; accord, *In re Marriage of Greenway* (2013) 217 Cal.App.4th 628, 641 ["There is a large body of case

18

authority reflecting an extremely low level of mental capacity needed before making the decision to marry or execute a will."].)

The probate court impliedly relied on section 6100.5 to assess Jackson's capacity, finding Jackson "was sharp, knew what she wanted, knew her assets, and was able to identify her biological family," consistent with the language of section 6100.5, subdivision (a)(1) and (2). The court properly relied on section 6100.5 because, like the trust instruments in *Andersen* and *Eyford*, the September 2017 trust closely resembled a will: it named the assets Jackson sought to devise and specified the beneficiaries who would receive them without involving additional complexities like those present in *Lintz*.

2. *Ammons has not met his burden to show Jackson lacked testamentary capacity as a matter of law*

On appeal Ammons relies on three primary pieces of evidence to show Jackson had diminished capacity in executing the September 2017 trust: (1) the allegations in the Walnut property complaint regarding Jackson's diminished capacity; (2) Jackson's failure to inform Ammons of the September 2017 trust; and (3) the "degradation of [Jackson's] ability to write," as shown by the notes she took while at the convalescent facility. This evidence does not compel a finding that Jackson lacked testamentary capacity.

As the probate court observed in finding Jackson had testamentary capacity, witnesses who associated with Jackson in 2017, including Dr. Tracy, Chandra, and Schoettle, attested to Jackson's mental acuity, and no other witness (including Ammons) testified to the contrary. Moreover, Schoettle testified that Jackson completed the trust document in her own

19

handwriting, which included naming beneficiaries and listing her assets; she expressed her desire to include the trust in the Walnut property action; and she discussed with Schoettle some of the trust's contents and the potential need for a related conveyance. And, according to Schoettle, Jackson instructed him regarding the terms of a relatively complex promissory note related to the sale of the Walnut property.

Although the Walnut property complaint alleged Jackson was limited in function within the meaning of section 811 and substantially unable to manage her financial resources or resist fraud or undue influence, the probate court could have reasonably found these allegations did not rebut the significant showing at trial that Jackson had testamentary capacity. Moreover, there was no testimony at trial regarding the basis for the allegations in the Walnut property complaint. Further, the allegation that Jackson was limited in function within the meaning of § 811 did not preclude Jackson from having testamentary capacity under section 6100.5 which, as discussed, requires a significantly lower mental capacity.[6]

---

[6] In his reply brief, Ammons argues the allegations in the Walnut property complaint constituted judicial admissions that the probate court should not have disregarded. However, "we do not consider arguments raised for the first time in a reply brief absent good cause," a showing that Ammons has not made. (*Champir, LLC v. Fairbanks Ranch Assn.* (2021) 66 Cal.App.5th 583, 598; accord, *Altavion, Inc. v. Konica Minolta Systems Laboratory, Inc.* (2014) 226 Cal.App.4th 26, 63, fn. 27 [argument made for the first time in reply brief was forfeited].) Even if we were to consider the argument, "'[a] judicial admission is effective (i.e., conclusive) *only* in the particular case.'" (*Minish v. Hanuman Fellowship* (2013) 214 Cal.App.4th 437, 456.) Although Ammons requests that we make an exception to this

20

With respect to Jackson's purported degraded handwriting, Ammons has forfeited this contention by raising it for the first time on appeal. (See *Cook v. University of Southern California* (2024) 102 Cal.App.5th 312, 325 [""Failure to raise specific challenges in the trial court forfeits the claim on appeal.""""]; *Bitner v. Department of Corrections & Rehabilitation* (2023) 87 Cal.App.5th 1048, 1065 ["Having failed to raise or develop this issue in the trial court, plaintiffs cannot raise the issue for the first time on appeal."].) Moreover, even if Ammons had not forfeited this argument, no witness at trial, including Ammons's own handwriting expert, testified regarding changes to Jackson's handwriting or how such changes bore on her mental capacity.

C.    *The September 2017 Trust Was Valid*

Ammons contends the September 2017 trust was invalid because it did not contain trust property, and therefore, it did not meet section 15202's trust property requirement. The probate court did not err in concluding otherwise.

The necessary elements of a valid trust are (1) an intention to create a trust (§ 15201); (2) trust property (§ 15202); (3) a trust purpose (§ 15203); and (4) a beneficiary (§ 15205). Section 15200 sets forth the methods for creating a trust, which include "[a] declaration by the owner of property that the owner holds the property as trustee." (*Id.*, subd. (a).)

_____

limitation on judicial admissions in the interest of justice, we decline to do so here, where ample evidence supported Jackson's testamentary capacity.

The Court of Appeal in *Heggstad, supra*, 16 Cal.App.4th at page 950 clarified that, with respect to creation of a trust under section 15200, subdivision (a), "a written declaration of trust by the owner of real property, in which he names himself trustee, is sufficient to create a trust in that property, and that the law does not require a separate deed transferring the property to the trust." Further, "a transfer of title is not necessary [to create a valid trust] when the settlor declares himself trustee in his own property" and declares "that that he holds the property in trust for another." (*Heggstad*, at pp. 947, 950; see *Dudek v. Dudek* (2019) 34 Cal.App.5th 154, 169 [applying *Heggstad* to transfer of intangible personal property without usual formalities of transfer]; *Kucker v. Kucker, supra*, 192 Cal.App.4th at pp. 94-95 [applying *Heggstad* to shares of stock where settlor's property assignment conveyed all of her real and personal property to herself, because general assignment "show[ed] that the [settlor] intended to transfer all of her personal property to the Trust"].)

The probate court did not err in finding the September 2017 trust was valid and ordering that the property listed in schedule A were assets of the trust. Jackson's written declaration of trust named herself as trustee, identified beneficiaries, and specified that the property in the attached schedule were assets of the trust. Further, as the court observed, Jackson completed the trust form in her own handwriting and provided a detailed list of the assets to be devised in the attached schedule, which manifested her intent to create the trust. Accordingly, Jackson created a valid trust despite the fact she did not execute formal deeds or conveyances transferring the property in schedule A into the trust.

D.     *The Evidence Does Not Compel a Finding That the Typed Trust Document Was a Valid Trust*

As discussed, one of the necessary elements of a valid trust is the settlor's manifestation of an intent to create a trust. (§ 15201.)  "'It is well settled that no particular language or terminology is necessary to create a trust; nor need the word "trust" or "trustee" be used; nor need all the conditions of the trust be expressed in a single paper; nor need a trust in personal property be in writing.'" (*Higgins v. Higgins* (2017) 11 Cal.App.5th 648, 661; accord, *Godoy v. Linzner* (2024) 106 Cal.App.5th 765, 780.)  "In general, a settlor may manifest the intention to create a trust by written or spoken words, or by conduct." (*Lonely Maiden Productions, LLC v. GoldenTree Asset Management, LP* (2011) 201 Cal.App.4th 368, 379-380, citing Rest.3d Trusts, § 13, com. b, p. 207.)  "In interpreting the settlor's words and conduct, the circumstances surrounding the transfer may be considered unless they are excluded by the parol evidence rule." (*Lonely Maiden*, at p. 380.)

In reaching its conclusion that Ammons did not meet his burden to show that Jackson created a valid trust by executing the typed trust document, the probate court relied on the fact that no witnesses, including Ammons, testified they saw a signed version of the typed trust document; Jackson never informed Schoettle that she had executed a new (and superseding) trust; Ammon's testimony about the typed trust document was contradicted by Gordon (who said he never saw a trust document giving assets to Ammons) and Schoettle (who had never seen a typed trust); and Jackson requested the September 2017 trust (not another trust) prosecute the Walnut property action.

Ammons argues he met his burden because Gordon testified he remembered typing a trust for Jackson and witnessing its signing; Jackson directed Ammons to the typed trust document; and the typed trust document referenced the amendment to escrow and other documents executed in 2018 (that is, after the September 2017 trust), showing that the typed trust superseded the prior trust.

Ammons has not met his burden on appeal to show this evidence compels a finding in his favor as a matter of law. Although Gordon recalled typing a trust for Jackson and witnessing its signing, he conceded his recollection of the signing and other events relevant to the case was "'vague.'" Further, in contrast to the typed trust document, Gordon testified the document he drafted did not mention Ammons, and Gordon did not recognize the typed trust document when he viewed it at trial. And the probate court found that Gordon, in describing a typed document, was recalling the amendment to escrow that was notarized, bore Gordon's signature, and provided terms and conditions for the sale of the Walnut property. The fact the typed trust document described other documents executed in 2018 did not show Jackson's intent to create a valid and superseding trust. With respect to Ammons's testimony that Jackson showed him the typed trust document, he did not testify that he saw her signature on the document. This evidence, taken together, does not compel a finding contrary to the wealth of evidence showing the operative trust was the September 2017 trust.

E.     *Ammons's Judicial Estoppel Argument Lacks Merit*

Ammons contends Dilonell is judicially estopped from asserting Jackson's mental competence because she adopted the

24

Walnut property complaint's allegations that Jackson was elderly within the meaning of section 811 and was unable to manage her financial resources or resist undue influence. However, Ammons forfeited this contention by not raising it in the probate court. Ammons presented multiple arguments in his objection to Dilonell's *Heggstad* petition and in his petition to set aside the September 2017 trust, but he never asserted judicial estoppel. Ammons does not point to any portion of the record where he raised the issue, and our own review of the record has not revealed any. Thus, the issue is forfeited. (See *Estate of Martino* (2023) 96 Cal.App.5th 596, 613 [judicial estoppel forfeited in probate action where objectors did not raise the issue in their response to the petition, joint trial readiness conference report, or at trial]; *Lee v. West Kern Water Dist.* (2016) 5 Cal.App.5th 606, 631 [judicial estoppel argument forfeited where issue not raised until after verdict].)

Even if Ammons had not forfeited this argument, he has not established all the elements necessary for judicial estoppel. Judicial estoppel applies when "'"'(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake.'"'" (*People v. Castillo* (2010) 49 Cal.4th 145, 155.) Ammons failed to present any evidence on the third element: that the probate court in the Walnut property action adopted or found true the allegations regarding Jackson's incapacity. To the contrary, the probate court ordered a sale of the Walnut property and permitted either party to bid on the

25

property, and the parties reached a stipulated settlement "on the remaining accounting issues."[7] And, as to the fifth element, Ammons did not present any evidence that the allegations in the Walnut property complaint were not made by ignorance or mistake (or any testimony as to the basis for the allegations in the Walnut property complaint).

## DISPOSITION

The judgment is affirmed. Dilonell is to recover her costs on appeal.

FEUER, J.

We concur:

MARTINEZ, P. J.

STONE, J.

---

[7] We take judicial notice of the opinion in *Dilonell v. Chandler* (Mar. 23, 2022, B310695) (nonpub. opn.).